G. Mark Albright, Esq.
Nevada Bar No. 001394
D. Chris Albright, Esq.
Nevada Bar No. 004904
ALBRIGHT STODDARD WARNICK & ALBRIGHT
Quail Park I, Building D-4
801 South Rancho Drive
Las Vegas, Nevada  89106-3854
Telephone:   (702) 384-7111
Facsimile:    (702) 384-0605
Email:  gma@albrightstoddard.com
Email:   calbright@albrightstoddard.com

Mark C. Dangerfield, Esq.
Paul Charlton, Esq.
Gallagher & Kennedy, P.A.
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone:  (602) 530-8000
Facsimile:   (602) 530-8500
Email:  mcd@gknet.com
Email:  paul.charlton@gknet.com
*Pro Hac Application Pending*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TASER INTERNATIONAL, INC., a Delaware corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **(Securities Fraud under 15 U.S.C. § 78j; Trade Libel; Unfair Competition under the Lanham Act, 15 U.S.C. § 1125; Abuse of Process; Injunctive Relief)** |
| STINGER SYSTEMS, INC., a Nevada corporation; JAMES F. MCNULTY, Jr., a Nevada resident; and ROBERT GRUDER, a Florida resident, | |
| Defendants. | **(Jury Trial Demanded)** |

2003986

1    Plaintiff, TASER International, Inc. ("TASER"), for its Complaint against

2    Defendants Stinger Systems, Inc. ("Stinger"), James F. McNulty, Jr., and Robert Gruder

3    (collectively "Defendants") alleges as follows:

4    **<u>NATURE OF THE CASE</u>**

5    1.    This action seeks money damages and injunctive relief because of the

6    Defendants' ongoing plot to damage TASER through fraudulent and misleading press

7    releases, defamatory "whisper campaigns" to potential customers and investors of

8    TASER, and the Defendants' use of lawsuits for marketing purposes, rather than as a

9    vehicle for seeking relief from the Court.

10    **<u>JURISDICTION AND VENUE</u>**

11    2.    This Court has jurisdiction over the matters asserted herein under 28 U.S.C.

12    §§ 1331, 1332, and 1367, and under 15 U.S.C. § 78aa.

13    3.    Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(b) and 15

14    U.S.C. § 78aa.

15    **<u>PARTIES</u>**

16    4.    Plaintiff TASER International, Inc. ("TASER") is a Delaware corporation

17    with its principal place of business at 17800 N. 85th Street, Scottsdale, Arizona 85255-

18    6311.

19    5.    Defendant Stinger Systems, Inc. ("Stinger") is a Nevada corporation with

20    its principal place of business at 2701 N. Rocky Point Drive, Suite 1130, Tampa, Florida

21    33607.

22

6.     Defendant Robert Gruder ("Gruder") was the Chief Executive Officer of Stinger during the majority of the events described herein.  Currently, Gruder is the Chairman and President of Stinger.  Gruder is a Florida resident.

7.     Gruder has significant contacts with the State of Nevada and has purposefully availed himself of the benefits and protections of Nevada law, including by acting as the CEO of Stinger, a Nevada Corporation.  Moreover, Gruder, both personally and in his capacity as Stinger CEO, has taken and/or threatened to take various acts which are directed towards and will cause injuries to the citizens of the State of Nevada.

8.     Defendant James F. McNulty, Jr. ("McNulty") is a Nevada resident who, among other things, provides legal counsel to Stinger.

9.     At all times relevant to this Complaint, McNulty was an agent of Stinger authorized to speak and act on behalf of Stinger.

## COMPANIES AND INDIVIDUALS RELEVANT TO THIS MATTER

### A.     TASER International.

10.     TASER was founded in 1993 by Rick and Tom Smith.  The company develops numerous technologies for use by law enforcement, military, private security, and consumers.  TASER is well-known for its TASER® Electronic Control Device ("ECD") product line.

11.     An ECD is a device that delivers electrical current to a subject, temporarily incapacitating that subject.  Unlike a "stun gun," which usually requires direct physical contact between the subject and the device, TASER's ECDs can fire small probes that

3

attach to a subject and allow a user to temporarily incapacitate the subject from a distance.

12.    TASER has had significant success marketing its ECDs.  Over 13,000 law enforcement, correctional, and military agencies in 44 countries deploy TASER ECDs. Since 1998, TASER has sold over 359,000 ECDs to law enforcement, and over 176,000 in the consumer market.  TASER has expanded its product offerings beyond ECDs into other areas, such as tactical support equipment.

13.    TASER began publicly trading on the NASDAQ-GS in May, 2001 under the "TASR" ticker symbol.

14.    As TASER is a publicly-traded company, Yahoo! Finance (http://finance.yahoo.com) maintains a webpage dedicated to news and financial information related to TASER.

15.    When TASER's ticker symbol is mentioned in a press release, whether that press release is issued by TASER, a competitor, or a wholly unrelated company, the press release will automatically appear on TASER's Yahoo! Finance Bulletin Board.

**B.    <u>Stinger Systems and Gruder.</u>**

16.    Defendant Stinger produces a competing ECD.  Stinger is a publicly-traded company, which trades on the Over the Counter Bulletin Board and the Pink Sheets, under the "STIY.OB" ticker symbol.

17.    Gruder was Stinger's CEO during the majority of the events described herein.  Gruder was also the company's second-largest shareholder.

18. In or about 2004, McNulty sold patents and molds to Stinger in exchange for $100,000 and 75,000 shares of Stinger stock.

19. Upon information and belief, McNulty, with Gruder's approval, drafted press releases for Stinger, in which he made false statements of material fact, and/or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

20. On January 28, 2008, the Securities and Exchange Commission filed a complaint against Stinger and Gruder in the Northern District of Georgia. The complaint alleges that Stinger and Gruder issued press releases and direct mailings in which they made material misrepresentations and omissions regarding Stinger's products, artificially inflating the price of Stinger stock and "causing a spike in trading volume," in violation of 15 U.S.C. 78j(b).

21. In 2008, Gruder stepped down as CEO of Stinger, and now holds the titles of Chairman and President of Stinger.

**C.    James F. McNulty, Jr.**

22. McNulty is an attorney, licensed to practice in the State of California but, upon information and belief, is living in or near Las Vegas, Nevada.

23. Upon information and belief, McNulty holds several patents for designs and molds for ECDs and similar devices.

24. At one time, McNulty held stock in both Stinger and a company called Law Enforcement Associates, which stock he obtained by selling molds and patents to these companies.

25.    McNulty drafted press releases for several companies which sell ECDs and other devices in competition with TASER.  Relevant to this matter, McNulty has drafted press releases for Bestex Company, Inc. and Stinger.

**D.    Bestex Company, Inc.**

26.    Bestex Company, Inc. ("Bestex") is a privately-held company that distributes and sells a variety of products, including flashlights, alloy wheels, and stun guns.  Bestex does not distribute or sell a projectile-based ECD.  Rather, it distributes and sells traditional "stun guns" or stun batons, which require direct contact between the subject and the device.

27.    Yong Suk Park ("Park") is the owner of Bestex.  He is a Korean national, and upon information and belief, is not fluent in English.

28.    McNulty has publicly claimed that he has represented Bestex *pro bono* in litigation. *See* "Bestex Company, Inc. to Introduce New Projectile Stun Gun Models to Consumer Market," January 17, 2008, attached as Exhibit 1 and incorporated by reference.

29.    McNulty drafted press releases at the request of Bestex and Park with the goal being to harm TASER and drive down the price of TASER's stock.  In these press releases, Park is quoted, speaking fluent English.

30.    Upon information and belief, McNulty drafted press releases for Bestex, in which he made false statements of material fact, and/or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

E.      **Law Enforcement Associates/Audio Intelligence Devices.**

31.    Law Enforcement Associates ("LEA") produces and sells surveillance equipment for use by law enforcement.  The company maintains an audio-based intelligence unit, Audio Intelligence Devices ("AID") tasked with developing audio surveillance devices, such as body bugs, micro recorders, and other stealth recording devices.

32.    LEA/AID is a publicly traded company which trades on the American Stock Exchange ("AMEX") under the "AID" ticker symbol.

33.    Paul Feldman ("Feldman") is the President and Treasurer of LEA/AID.

34.    As discussed above, McNulty owned certain stun gun patents and molds. In or about 2004, McNulty sold patents to LEA in exchange for 750,000 shares of restricted LEA stock.

35.    Also in or about 2004, McNulty sold to LEA molds for a competing stun gun in exchange for an additional 20,000 shares of restricted LEA stock.

36.    On several occasions, McNulty approached Feldman and encouraged Feldman to involve LEA in business arrangements organized by McNulty.

37.    This Complaint specifically refers to two conversations between McNulty and Feldman: a telephone conversation that took place on January 25, 2007, and an in-person conversation between them that took place on February 27, 2008.

**GENERAL ALLEGATIONS**

38.    Through the use of false and misleading press releases, authored by McNulty and issued by Bestex, or authored by McNulty with, on information and belief,

7

Gruder's assistance or approval, and issued by Stinger, defendants conspired, attempted, and succeeded in damaging TASER and in manipulating the stock prices of TASER and Stinger.

39.   Upon information and belief, McNulty owned shares of Stinger stock and LEA stock when he authored misleading press releases.  He acquired these shares through the sales of patents and molds, as described above.  And as alleged above, Gruder was the second-largest shareholder of Stinger.

40.   McNulty and Gruder had the means and motive to issue false and misleading press releases targeting TASER.

41.   The false and misleading information put out by McNulty and Gruder have damaged TASER's reputation and business prospects and, as they intended, have artificially manipulated TASER's stock price, thus further damaging TASER.  Indeed, McNulty privately bragged in the February 27, 2008 conversation with that he personally "sent TASER down 150 million dollars in a day and a half" by his press releases, apparently referring to TASER's loss of market capital as a result of the depressed stock price.

42.   By issuing false and misleading information and artificially depressing TASER's share price, the Defendants have damaged TASER by, among other things, causing some investors to "short" TASER stock, and causing investors to be more hesitant to infuse capital into the company, thus making capital scarcer and raising the cost of capital to the company.  The company's reputation is also damaged by the false

information, thus harming the company's sales and potentially improving the sales of the company's competitors, including Stinger.

43.   In addition, under contracts with its employees and directors, TASER is required to issue options to purchase TASER stock to certain of those employees and directors. The exercise price of these stock options is set at the trading value of the stock on the day of issuance, so that when options are issued at a time during which TASER's stock price is artificially depressed by virtue of Defendants' actions, the exercise price for the stock option is artificially low. When the employee or officer thus subsequently exercises the option by paying the exercise price to the company, the company receives less money than it would have received but for the Defendants' actions.

44.   The Defendants' fraudulent manipulation of TASER's stock price also damaged TASER by increasing the charge to earnings that TASER must take for issuing the options. Pursuant to generally accepted accounting principles, the value of stock purchase options must be taken as a charge against a company's earnings. And as a result of the artificial manipulation of TASER's stock price by the Defendants as described in this Complaint, TASER's stock price became more volatile, which in turn increased the company's stock-based compensation expense, thus reducing the company's earnings.

45.   This Complaint discusses no fewer than six separate materially misleading public communications about TASER that were authored, issued, filed or otherwise publicly distributed by the Defendants, one during 2007 and the balance during 2008 alone. These are not the sole examples of the Defendants' misleading communications,

1  but they are examples of such.  Injunctive relief is appropriate to put a stop to such

2  actions.

3      46.     As noted, TASER has obtained information regarding two conversations

4  between LEA's Paul Feldman and McNulty in which McNulty described his plan to harm

5  TASER by, among other things, drafting and publishing press releases containing false

6  statements or material omissions.  McNulty took such actions both to damage TASER

7  and to benefit himself, as well as Stinger and Gruder.

8      47.     McNulty acted willfully and maliciously.

9                    **THE BESTEX/LEA "ALLIANCE"**

10     48.     In January 2007, McNulty approached LEA, ostensibly on behalf of

11  Bestex.  McNulty proposed to Feldman, LEA's president, that the two companies form a

12  partnership to manufacture a stun gun that could compete with TASER's offerings on the

13  consumer market.

14     49.     McNulty proposed that LEA produce the gun body using the patents that

15  McNulty had previously sold to LEA.  McNulty proposed that Bestex produce the

16  "cartridges" for the guns—components equivalent to a firearm's ammunition magazine.

17     50.     As McNulty described his proposed alliance, Feldman became concerned

18  about the legalities of McNulty's proposal and his motivations for making the proposal.

19  Specifically, McNulty was proposing a partnership in name only—one that would result

20  in publicity for both companies, but would likely not result in creation or production of a

21  competing ECD.

22

51.     Feldman also feared that McNulty's plan essentially amounted to fraud on the market and market manipulation.

52.     During McNulty's January 25, 2007 conversation with Feldman, it became clear to Feldman that McNulty was proposing a sham transaction between Bestex and LEA.

53.     McNulty first suggested that LEA put out an announcement that LEA had sold 12,500 units of a competing stun gun.  McNulty suggested that Bestex would purchase the devices.

54.     Upon information and belief, from prior conversations, McNulty and Feldman knew that even if LEA and Bestex had made such an arrangement, the actual value of the sale would be *de minimus*, due to the low value of the component parts involved.

55.     As McNulty explained his plan, rather than disclose to the public the dollar amount for the sale, LEA would publicize only the quantity sold – 12,500 – which was a large quantity of ECDs compared to what TASER would sell in a single sale in the consumer market. McNulty told Feldman that, with a press release announcement like that, which didn't disclose the actual dollar value, LEA's stock "should go crazy." McNulty also volunteered to prepare a "proposed press release" to send to Feldman.

56.     McNulty explained that by not disclosing the details nor the dollar amounts associated with the sale, investors would purchase LEA stock, relying merely upon the quantity sold.  As McNulty noted in the conversation, LEA could keep the actual details

of the transaction "close knit" for probably three to four months, before people could find out the actual value of the sale was small.

57.     As a result of the announcement, McNulty explained, the value of LEA's stock would be increased, based upon the false public perception the announcement would create that LEA was not only competing with TASER in the consumer market, but outselling TASER 5-to-1.

58.     McNulty told Feldman that the matter had to be "promoted right," with an announcement just of the volume, and that a "plus" to such an announcement was that it would get on TASER's Yahoo! Finance website, because LEA would be producing a product that would ostensibly compete with TASER.

59.     McNulty also predicted that if LEA so announced the sale of 12,500 units, the announcement would damage TASER and make TASER "a $2.00 stock."

60.     In addition to discussing the sham transaction, McNulty explained to Feldman that he sometimes drafted Stinger press releases in order to "unload" the remaining Stinger stock he had received.

61.     For example, McNulty mentioned that, on Monday, he would be putting out a Stinger press release that would enable him to "get rid of" the rest of his Stinger stock.

62.     In fact, on Monday, January 29, 2007 – the Monday immediately after the January 25, 2007 conversation – Stinger issued a press release entitled "Stinger Systems Sells Stingers to Agencies in New Hampshire."

63.     McNulty also explained to Feldman how, to sell stock, he used press releases that he authored for Bestex. He said, for example, he did a news release from

12

Bestex that "pushed" LEA's stock up to $3.20 a share, and then he got rid of "a good portion" of his stock. In the press release McNulty drafted for Bestex, he had Park, the CEO of Bestex, specifically reference Stinger.

64. Upon information and belief, McNulty used his knowledge of the impending press release to choose a profitable time in which to "unload" or sell a portion of his Stinger stock.

65. McNulty also described his intent to use lawsuits strategically to damage TASER and to drive down the price of TASER's stock. McNulty explained that he was planning on suing TASER under the Racketeer Influenced and Corrupt Organizations (RICO) statutes. McNulty said he was planning on hitting TASER with a RICO suit, and asking that the Court dissolve TASER as a remedy for a corrupt enterprise. While McNulty acknowledged that such an extreme remedy "was never going to happen," that would not be the real point of his RICO suit. McNulty's real goal was instead the adverse effect his RICO suit would have on TASER's stock when he sued not only TASER, but TASER's senior executives as well.

66. Incredibly, McNulty even admitted to Feldman how McNulty intended to blatantly lie in a press release, by claiming in the press release that Stinger was looking at manufacturing TASER's cartridges, even though it really wasn't.

67. After reviewing McNulty's proposal, the LEA Board rejected it, concerned that entering into the contract with Bestex in the manner proposed by McNulty could be viewed as stock manipulation.

68.     On February 9, 2007, Feldman, on behalf of LEA, sent a letter to McNulty. A copy of the letter is attached as Exhibit 2 and incorporated by this reference.

69.     In the letter, Feldman recounted the telephone conversation he had with McNulty.  He explained that the Board would not approve a contract between Bestex and LEA.

70.     Specifically, the letter stated:

> "Under no circumstances will LEA be put in the position where it is possible that anyone could point a finger at the Company, its Board members or anybody affiliated with the Company that they participated in any attempt to manipulate LEA's stock.  This is a serious matter and therefore we will not enter into a contract with Bestex and will not authorize any announcement which we do not believe are above board, and factually accurate.  We do not publish announcements for the purpose of moving shares.  Again, we will not be doing any business with Bestex and we will not publish any announcements or do anything which even give the appearance of any attempt to manipulate the stock of our Company."

71.     Undaunted by LEA's sharp rebuke, almost a year later, on January 17, 2008, Bestex released a press release entitled "Bestex Company, Inc. to Introduce New Projectile Stun Gun Models to Consumer Market.  Company Files Briefs in TASER Case." *See* Exhibit 1.

72.     In the press release, Park, the CEO of Bestex, is quoted as saying "In fact, Bestex Company, Inc. has also discussed marketing American Exchange traded Law Enforcement Associates, Inc. Audio Intelligence Devices (AID) business' consumer model non-firearm spring launched projectile stun gun...."

73.     However, LEA had no intention to partner with Bestex, as LEA had clearly indicated in January, 2007.

14

74.   The January 17 press release also contains additional "quotes," purportedly
by Bestex CEO Park.  Many of Park's lengthy comments are directed at TASER, and
were patently intended to put TASER in a negative light.  For example, Mr. Park is
quoted at saying that TASER should be "embarrassed and ashamed" at its actions.

75.   McNulty also figures prominently in the January 17 press release, as Park is
quoted as saying that Bestex "is extremely grateful" to McNulty for supposedly, "on
moral grounds," defending Bestex "pro bono."

76.   The press release also goes out of its way to tout LEA:  "Bestex Company
is quite impressed with the performance of [LEA's] low cost consumer projectile stun
gun and with [LEA's] product development generally."

77.   As evidenced by a February 27, 2008 conversation with Feldman, McNulty
authored the above press release.  In fact, McNulty admitted to Feldman in that
conversation that McNulty had "wanted to try and push your stock up" with the release.

78.   On January 18, 2008, Eric P. Littman, counsel for LEA, contacted Douglas
Klint, the Vice President of TASER.  Mr. Littman explained that McNulty had forwarded
a preliminary proposal to LEA, "allegedly on behalf of Bestex."  Mr. Littman further
explained that there were no discussions, as described in the Bestex January 17 press
release.  Instead, the LEA Board had flatly rejected the proposal after concluding that
"McNulty's proposal was a veiled attempt at market manipulation."  *See* Email from Eric
Littman to Douglas Klint, January 18, 2008, attached as Exhibit 3 and incorporated by
this reference.

**PROTECTIVE ORDER**

79.     On January 5, 2007, TASER filed a lawsuit against Stinger in the District of Arizona. *See TASER Int'l., Inc. v. Stinger Systems, Inc.*, 2:07-cv-00042-MHM.

80.     In that suit, TASER alleged claims of patent infringement and false advertising against Stinger. One of the technologies discussed in the lawsuit is Stinger's Quantum Flyback Technology ("QFT") – which Stinger claimed was "patented circuitry technology."

81.     Following the common practice in cases involving patents and other proprietary intellectual property, the parties stipulated to a protective order, regarding discovery, to avoid dissemination of trade secrets and similar materials to the public, and to protect the parties' interests in their respective intellectual property.

82.     The protective order allowed parties to designate materials produced in discovery as either "CONFIDENTIAL" or "ATTORNEY'S EYES ONLY."

83.     According to the protective order, materials designated as "ATTORNEY'S EYES ONLY" were severely restricted. The parties themselves were not allowed to view any document so designated. In addition, only two specifically-named TASER in-house attorneys were allowed to view documents bearing the "ATTORNEY'S EYES ONLY" designation.

84.     On May 21, 2007, Judge Murguia, the judge presiding over the Arizona *TASER v. Stinger* matter, entered the protective order in the case. (See Docket #27). On May 31, 2007, Stinger issued a press release entitled "TASER International Stipulates to Restrictive Protective Order to Glimpse Stinger Systems' New QFT Technology Capable

16

of Being Fired in Wireless Projectile." *See* press release, attached as Exhibit 4, and incorporated by this reference. On May 31, the day of the release, the price of TASER stock dropped from $11.09 a share to as low as $10.42 a share, ultimately closing at $10.54 a share. The $0.67 drop in share price represented an approximate reduction of $40,000,000 in TASER's market capital.

85. Because it is standard procedure for a party claiming patent infringement to view the technology at issue pursuant to the terms of a protective order issued by the court, the press release, which attributed great significance to the protective order, was misleading and false. It gave the impression that TASER entered the protective order so that it could gain proprietary information about a competitor.

86. Additional facts, including discussion about the prevalence of protective orders in civil litigation, along with an acknowledgement that TASER employees would not be able to review the proprietary information under the protective order, would have made the press release not misleading.

87. The misleading and false statements in the press release damaged TASER.

88. Upon information and belief, relying upon the misleading and false statements in the press release, investors in TASER sold shares that they would not have otherwise sold but for the misleading statements.

89. Upon information and belief, relying upon the misleading and false statements in the press release, investors in Stinger purchased shares that they would not have otherwise purchased but for the misleading statements.

90.     Contrary to the implication of the press release he drafted, McNulty knew that in cases like this it was normal to get access to the other side's propriety material with the help of a protective order, and he specifically admitted as much in the February 27, 2008 conversation with Feldman.

91.     As evidenced by the February 27, 2008 conversation, McNulty knew that the use of a protective order was normal, yet he authored a press release that was misleading.

92.     McNulty authored this press release with malice and with the intent to harm TASER.

93.     McNulty also authored this press release with the intent to artificially increase the price of Stinger stock.

94.     McNulty authored this press release both for his personal benefit, and for the benefit of Stinger, for which he was an agent.

95.     Upon information and belief, Gruder sanctioned the press release and participated in its creation. This is evidenced by the fact that Gruder was the CEO of Stinger at the time of the press release. Removing any doubt as to his complicity, Gruder is quoted in the press release discussing QFT.

## STINGER, GRUDER AND MCNULTY'S JANUARY 2008 PRESS RELEASES

### A.     January 9, 2008 Press Release.

96.     In a span of three days, Stinger and Gruder, through McNulty, released a series of press releases which, through misleading and false statements, significantly harmed TASER and negatively affected the price of TASER stock.

18

97.    On January 9, 2008, Stinger released a press release entitled "Stinger Systems Request Reexamination of TASER International's Intellectual Property."  *See* attached Exhibit 5, incorporated by this reference.  The press release contained a subheading which stated:  "Large Portion of TASER's Intellectual Property in Jeopardy."  *Id.*

98.    The press release explained that Stinger had submitted documents to the United States Patent and Trademark Office ("USPTO") to have TASER Patent No. 7,234,262 reexamined.  The press release implied that, were the reexamination successful, a significant portion of TASER's patents could be invalidated.

99.    The press release was misleading in numerous ways.

100.    First, the fact that one requests a patent reexamination is unremarkable.  Although one has requested a reexamination, it does not ensure that reexamination will be granted by the USPTO.  Furthermore, even if reexamination were granted by the USPTO, there would be no guarantee – or even likelihood – that reexamination would result in the USPTO finding an issue with the patent.  As federal courts have held, USPTO's mere granting of a reexamination "does not establish a likelihood of patent invalidity."  *Hoescht Celanese Corp. v. BP Chems., Ltd.,* 78 F.3d 1575, 1584 (Fed. Cir. 1996).

101.    Next, the patent that was the subject of Stinger's USPTO reexamination request was related to the ADVANCED TASER® M-26 – an older model that TASER no longer produces on a large scale.

102.   Finally, the press release significantly overstated the effect that a reexamination of Patent No. 7,234,262 would have on TASER's intellectual property. Even if Patent No. 7,234,262 were invalidated via the patent reexamination process, TASER would not be hampered in any way in its ability to manufacture or market its then-current line of ECDs, including the TASER X26 model.

103.   By selectively including information about the importance of the reexamination process, Stinger made false statements and omitted facts that would make the press release not misleading.

104.   By stating that the reexamination (and subsequent invalidation) of Patent No. 7,234,262 would place a "large portion" of TASER's intellectual property in jeopardy, Stinger made false statements and omitted materials facts that would make the press release not misleading.

105.   On information and belief, in large measure because of the misleading press release, there was a substantial sell-off of TASER stock on January 9, 2008 with trading volume increasing from 1,427,996 shares traded on January 8, to 5,360,203 shares traded on January 9.  In addition, TASER's stock price, which opened on January 9 at $13.20 a share, dropped as low as $10.11 a share, ultimately closed at $12.54 a share on that day, and then continued to drop over the next few days, as discussed further below.  The January 9 drop in share value once again caused a loss in TASER's market capital of approximately $40,000,000.

106.   As a result of the false and misleading statements made by Stinger, through its agent McNulty, TASER was damaged.

**B.**   <u>**January 10, 2008 Press Release.**</u>

107.   In reaction to Stinger's misleading and false January 9, 2008 press release and the effects of the press release on the market, Jeffries & Company, an independent securities firm, issued a report on January 10, 2008 entitled "Patent Confusion Creates Buying Opportunity."

108.   The report described Stinger's January 9, 2008 press release as "misleading" and described the sell-off spurred by the misleading press release as "an overreaction."

109.   In response, Stinger on January 10 issued yet another misleading press release entitled, "Jeffries & Co. Information on TASER's 7,234,262 Patent 'Grossly Inaccurate.'" (*See* copy attached as Exhibit 6.)  On information and belief, McNulty, assisted by Gruder or with Gruder's approval, authored the January 10 release as well.

110.   Stinger's January 10 press release wrongly condemned the Jeffries report as "grossly inaccurate," and reiterated some of the misleading claims from Stinger's January 9 press release.

111.   Betraying McNulty's own involvement with the release, the release quotes McNulty as saying the Jeffries report was "misinformation" that was "being fed to the financial markets."  The release goes on say that McNulty – purportedly "having no equity interest in Stinger Systems, Inc. whatsoever," considered the patent reexamination "to be serious."

112.   To try and mitigate the damage done by these false and misleading press releases, TASER issued its own press release in order to address the blatantly misleading

21

and false statements made by Stinger and McNulty. *See* "TASER International Comments On Intellectual Property: Motives of Stinger's Unusual Press Releases Questioned", January 10, 2008, attached as Exhibit 7 and incorporated by this reference.

113.    But the Stinger/Gruder/McNulty press releases continued to impact TASER. On January 10, trading volume remained at an extremely high volume, with sales of 5,852,230 shares. And TASER's share price closed even lower at $11.97 a share.

**C.    January 11, 2008.**

114.    On January 11, 2008, Stinger released *yet another* press release related to the patent reexamination matter.

115.    This press release was entitled "Stinger Systems Comments on TASER International Patent Case Comments." *See* attached Exhibit 8, incorporated by this reference. This press release also contained false or misleading information. For example, the press release misleadingly implies that the overwhelming majority of requests for patent examinations result in the patents being invalidated. In fact, the patent and trade mark office cancels all claims to a patent in only about 12% of such cases, according to a recent federal court decision. *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1110 (N.D. Cal. 2006). And as noted before, the particular patent at issue in the Stinger re-examination request was not one that was critical to TASER's ongoing operations.

116.    Stinger's January 11 press release also included the misleading and unsubstantiated suggestion – quoting Gruder – that "most law enforcement agencies" Stinger has called on "strongly prefer the Stinger S-200 over the Taser X26," and that

22

"many departments currently using Taser have expressed interest in trading them in for Stingers." The release goes on to refer to McNulty's comments, and even manages to mention Bestex.

117.    On information and belief, this January 11, 2008 press release was also drafted by McNulty, with the aid or approval of Gruder.

118.    On information and belief, stemming at least in part from the misleading January 11 press release, TASER stock closed down still lower, at $11.57 a share. Indeed, the drop from $13.20 a share on January 9, to $11.57 a share on January 11, meant that TASER's market capital had plummeted nearly $100 million in three days. On information and belief, the Defendants' misleading press release caused or contributed to the loss.

119.    This press release too, and the misinformation in it, damaged TASER.

**D.    Modification of Stinger's Website.**

120.    The January 9 press release discussed above also appeared on Stinger's website, located at http://www.stingersystems.com, soon after it was published. The press release appeared on the "Press Releases" page of the Stinger website. *See* Screenshots from Stinger Systems, Inc. website as of January 18, 2008, attached as Exhibit 9 and incorporated by this reference.

121.    However, in the months following the publication of the January 9, 2008 press release, Stinger modified the "Press Releases" section of its website significantly. First, Stinger removed the January 9 press release entry from its website. Then, Stinger created a press release entry on January 13, 2008 – a Sunday – entitled "Stinger Systems

23

request reexamination of TASER International's Intellectual Property." This was the *same* title that the January 9, 2008 press release was given.

122.   However, Stinger did not include any text in the press release. Instead, a user who clicks on the press release will be greeted by a blank press release, displaying only the title of the press release. *See* Screenshot of January 13, 2008 press release, attached as Exhibit 10 and incorporated by this reference.

123.   Next, Stinger created a press release entry on January 18, 2008 entitled "Large Portion of TASER's Intellectual Property in Jeopardy." This was the *same* subheading that was given to the January 9, 2008 press release. *See* Screenshot of January 18, 2008 press release, attached as Exhibit 11 and incorporated by this reference. However, Stinger neglected to change the date on the press release itself – which still reflected its original January 9, 2008 date.

124.   Upon information and belief, Stinger changed the dates on the press release in order to disguise the correlation between the false and misleading statements made by Stinger and the effect of those statements on TASER and the prices of TASER's and Stinger's stock.

125.   Similarly, upon information and belief, Stinger requested that Yahoo! remove the Stinger press releases from January, 2008 in which Stinger made false or misleading statements.

126.   On the Yahoo! finance site for Stinger, which McNulty referenced numerous times in the January 2007 and February 2008 Conversations, the only headline

24

which appears from the relevant time period is <u>TASER's</u> January 10, 2008 response to Stinger's false and misleading January 9, 2008 press release.

127.   Upon information and belief, Stinger had the press releases removed from its Yahoo! finance site in order to disguise the correlation between the false and misleading statements made by Stinger and the results of those statements on the prices of Stinger and TASER's stock.

### APRIL 2008 LAWSUIT AND RELATED MARKETING MATERIALS

128.   On April 18, 2008, Stinger filed a lawsuit against TASER in the District of Arizona. *See Stinger Systems, Inc. v. TASER Int'l,* 2:08-CV-00747-FJM.

129.   In the lawsuit, Stinger alleged claims of false advertising, unfair competition, and injurious falsehood.

130.   In the complaint, Stinger accused TASER of circulating a "preliminary" version of a study allegedly conducted "by the National Institute of Justice" (the "NIJ"). (The NIJ is the research, development, and evaluation agency of the United States Department of Justice.)  In fact, the January 25, 2008 report – a report for the NIJ that was prepared by the Florida Gulf Coast University Weapons & Equipment Research Institute – gives no indication whatsoever that it is "preliminary."  A copy of the first part of the report, including the Executive Summary, is attached as Exhibit 12.  The report methodically compared the TASER and Stinger ECDs, and found TASER's product superior to Stinger's.

131.   Moreover. Stinger's complaint fails to mention that on January 28, 2008, the NIJ, the government sponsor of the study, sent a letter to both Stinger and TASER,

giving both the opportunity to respond to the report.  *See* Letter from Operational Technologies Division, January 28, 2008, attached as Exhibit 13 and incorporated by this reference.  The letter clearly stated that it was providing a "draft final report."

132.    Additionally, when TASER requested a copy of the final report, the United States Department of Justice provided a copy of the same January 25, 2008 report, referring to the report as a "final report."  *See* Letter from Dorothy A. Lee, United States Department of Justice, May 22, 2008, attached as Exhibit 14 and incorporated by this reference.

133.    Therefore, Stinger's lawsuit, based on a claim that TASER had circulated a preliminary report in a misleading manner, was without merit.

134.    Although Stinger filed its lawsuit on April 18, 2008, Stinger waited to announce the suit until April 24, 2008 – the very day that TASER released its quarterly earnings.

135.    On April 24, 2008, Stinger then issued a press release entitled "TASER Sued for False Advertising, Unfair Competition and Injurious Falsehood."

136.    Upon information and belief, Stinger issued the press release to coincide with the announcement of TASER's quarterly earnings in order to harm TASER and drive down TASER's stock price.  And on April 24, 2008, TASER's stock, which opened at $8.25 a share, dropped almost a dollar, to $7.30 a share, before closing at $7.53 a share, with an extraordinary 16,013,070 shares having been sold.

137.    On information and belief, McNulty, with Gruder's assistance or approval, authored the false and misleading press release.

138.   Under Fed. R. Civ. P. 4(m), a plaintiff has 120 days in which to serve a defendant with a summons.  If a plaintiff fails to do so, the court "must dismiss the action."

139.   As Stinger filed its suit on April 18, 2008, it was required to serve the suit by August 18, 2008.

140.   Although the lawsuit was never served, this did not dissuade Stinger from readily using the "lawsuit" as a marketing tool after the time for serving the suit had passed.

141.   For example, on September 6, 2008 – weeks after the time for service had lapsed – Kevin Scholz, Regional Sales Director of Stinger, sent an email entitled "Stinger Sues TASER."  *See* Email from Kevin Scholz, September 6, 2008, attached as Exhibit 15 and incorporated by this reference.

142.   Attached to the email was a Word document entitled "Stinger Packet.doc." A copy of the document is attached as Exhibit 16 and incorporated by this reference.

143.   Both the email and the Stinger Packet document make numerous references to the lawsuit, and borrow liberally from the language of the Complaint.

144.   On October 8, 2008, Judge Martone, the Judge to which the case was assigned, issued an Order to Show Cause against Stinger.  The Order notified Stinger that the matter would be dismissed within 10 days – on October 17 – if Stinger was unable to show good cause for its failure to serve the summons and complaint.  Then on October 17, 2008, Stinger itself dismissed the complaint.

145.   Upon information and belief, Stinger filed the lawsuit with no intent to ever serve the suit on TASER or actually litigate the claims.  Rather, upon information and belief, Stinger's primary or sole objective in filing the suit was to improperly use the lawsuit as a tool to damage TASER and benefit Stinger, and to deflect focus from the NIJ report, which had been unfavorable to Stinger and its stun guns.

### USE OF YAHOO! FINANCE SITE

146.   In the press releases described in the Complaint, and in other press releases, Defendants included TASER's stock ticker symbol, TASR.

147.   As explained by McNulty during the February 27, 2008 conversation with Feldman, he did this in order to place press releases issued by TASER's competitors directly on TASER's Yahoo! finance site, where, according to McNulty, "50,000 people a day" will see it.

### COUNT ONE

### (Violation of Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b))

148.   TASER incorporates in this claim all the prior and subsequent allegations contained in the Complaint.

149.   Through the use of the mails or other instrumentalities of communication in interstate commerce, the Defendants intentionally made statements of material fact in press releases and e-mails which they knew to be untrue, and/or omitted to state material facts in press releases and e-mails which omissions they knew would render the press releases and e-mails misleading under the circumstances.

28

150.   The Defendants took the above actions for the purpose of harming TASER and defrauding and/or misleading actual and potential TASER shareholders, in violation of Securities and Exchange Commission Rule 10b-5 and 15 U.S.C. § 78j(b).

151.   The Defendants acted with the intent to artificially drive down the price of TASER stock and to artificially increase the price of Stinger stock and thus harm TASER and benefit TASER's competitors including Stinger and LEA.

152.   The Defendants' untrue statements of material fact and/or omissions of material facts in press releases and e-mails caused TASER stock to decline to an artificially low price—lower than it would otherwise have been if the Defendants had not acted unlawfully.

153.   The artificially-induced decline in TASER's stock price damaged TASER as discussed above.

154.   The Defendants' continuing efforts to harm TASER through such illegal practices entitle TASER to injunctive relief to stop Defendants from engaging in such practices.

### COUNT TWO

#### (Trade Libel/Defamation)

155.   TASER incorporates in this claim all the prior and subsequent allegations contained in the Complaint.

156.   As alleged in detail in the preceding paragraphs, Defendants made a series of false and misleading statements or omissions about TASER, including false and misleading statements about TASER's goods and its business.

157.   Those statements were false and defamatory.

158.   Defendants knew at the time the statements were made that the statements were false and defamatory.

159.   Defendants made the statements with reckless disregard for their truth.

160.   Defendants' wide publication of the false and defamatory statements was unprivileged.

161.   Defendants made the false and defamatory statements intentionally, with an evil mind and the intent to cause injury, and/or with reckless disregard of the substantial risks that their conduct might significantly injure TASER.

162.   TASER suffered damages as a result of Defendants' false and defamatory statements.

163.   In engaging in the foregoing conduct, Defendants acted with malice, fraud and oppression, and with a conscious and wanton disregard for TASER's rights and interests.  TASER is therefore entitled to an award of punitive and exemplary damages against Defendants.

## COUNT THREE

### (Violation of Lanham Act, 15 U.S.C. § 1125(a))

164.   TASER incorporates in this claim all the prior and subsequent allegations contained in the Complaint.

165.   As alleged in detail in the preceding paragraphs, Defendants made a series of materially false and misleading statements of fact or omissions about TASER that deceived or had the capacity to deceive the public.

1    166.    Those false and misleading statements were used in commerce, and in

2    connection with goods or services.

3    167.    The statements were part of Defendants' commercial advertising or

4    promotion, and misrepresented the nature, characteristics and qualities of TASER's

5    goods, services, or commercial activities,

6    168.    TASER suffered damages as a result of Defendants' false and defamatory

7    statements.

8                                    **COUNT FOUR**

9                                    **(Abuse of Process)**

10    169.    TASER incorporates in this claim all the prior and subsequent allegations

11    contained in the Complaint.

12    170.    Stinger filed suit against TASER on April 18, 2008 ("April 2008 lawsuit").

13    171.    Stinger never served the complaint on TASER, its time to do so expired,

14    and Stinger dismissed the lawsuit.

15    172.    Stinger publicly advertised, on at least two separate occasions (April 24,

16    2008 press release and September 6, 2008 marketing materials), the fact that it had filed

17    the lawsuit, and the nature of the allegations it asserted against TASER, even though it

18    had not served and never intended to serve the lawsuit.

19    173.    Stinger was aware of the timing of TASER's release of its quarterly

20    earnings, and upon information and belief, timed the lawsuit and the press release to

21    coincide with TASER's earnings' release.

22

174.   Stinger did not file the April 2008 lawsuit against TASER for the purpose of resolving a legal dispute or to otherwise legitimately use the legal process.

175.   Instead, Stinger filed the lawsuit for the primary and intended purpose of damaging TASER's business and goodwill, and driving down TASER's stock price.

176.   Stinger's filing of the April 2008 lawsuit without any intent to use its filing for any legitimate purpose, along with its publication of the lawsuit against TASER, are willful acts in the use of the legal process not proper in the regular conduct of a legal proceeding.

177.   TASER suffered damages as a result of Stinger's misuse of the legal process.

178.   In engaging in the foregoing conduct, Stinger acted with malice, fraud and oppression, and with a conscious and wanton disregard for TASER's rights and interests. TASER is therefore entitled to an award of punitive and exemplary damages against Stinger.

## COUNT FIVE

### (Deceptive Trade Practices)

179.   TASER incorporates in this claim all the prior and subsequent allegations contained in the Complaint.

180.   As alleged in detail in the preceding paragraphs, Defendants knowingly made false representations about the characteristics, benefits, or quantities of goods offered for sale by TASER.

181.   As alleged in detail in the preceding paragraphs, Defendants disparaged TASER's goods, services and business by false or misleading representation of fact.

182.   As alleged in detail in the preceding paragraphs, Defendants violated state and federal statutes relating to the sale of goods or services.

183.   Defendants' false and misleading statements constitute deceptive trade practices, and are prima facie evidence of Stinger's intent to injure its competitor TASER and to destroy or substantially lessen competition.

184.   TASER suffered damages as a result of the Defendants' deceptive trade practices.

## JURY TRIAL DEMANDED

185.   TASER requests a jury trial on all issues so triable.

WHEREFORE, TASER prays for judgment against Defendants as follows:

(a)   For temporary and permanent injunctive relief prohibiting McNulty, Gruder and Stinger from issuing press releases and other communications about TASER that contain false and misleading statements;

(b)   For money damages in an amount to be determined at trial;

(c)   For exemplary or punitive damages in an amount to be determined at trial;

(d)   For an award of TASER's attorneys' fees, costs and expenses incurred in bringing this action;

(e)   For an award of prejudgment and post-judgment interest on any amounts awarded herein; ands

///

(f)     For such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this _____ day of February, 2009.

ALBRIGHT STODDARD WARNICK &
ALBRIGHT

By: _____
      G. Mark Albright, Esq.
      Nevada Bar No. 001394
      D. Chris Albright, Esq.
      Nevada Bar No. 004904
      Quail Park I, Building D-4
      801 South Rancho Drive
      Las Vegas, Nevada  89106-3854

      Mark C. Dangerfield, Esq.
      Paul Charlton, Esq.
      Gallagher & Kennedy, P.A.
      2575 E. Camelback Road, Suite 1100
      Phoenix, Arizona 85016
      Telephone:  (602) 530-8000
      Facsimile:   (602) 530-8500
      Email:  mcd@gknet.com
      Email:  paul.charlton@gknet.com
      *Pro Hac Application Pending*
         *Attorneys for Plaintiff*

**VERIFICATION**

Douglas E. Klint declares the following:

I am Vice-President and General Counsel of TASER International, Inc., the plaintiff in this lawsuit.  I have read the attached Complaint, and to the best of my knowledge, information and belief, the facts set forth in the Complaint are true.  I make this declaration under penalty of perjury.

_____
Douglas E. Klint

## LIST OF TASER COMPLAINT EXHIBITS

1.  1/17/08 press release (re: McNulty has represented Bestex pro bono.
2.  2/9/07 letter from Feldman to McNulty
3.  1/18/08 e-mail from Littman to Klint
4.  5/31/07 Stinger press release re: TASER stipulates to protective order
5.  1/9/08 Stinger press release re: Stinger requests examination of TASER IP
6.  1/10/08 Stinger press release re: report of Jeffries & Co.
7.  1/10/08 TASER press release re: Stinger's motives in issuing press releases
8.  1/11/08 Stinger press release
9.  Screen shots of Stinger Web site as of January 18, 2008, showing 1/9/08 press release
10. Screenshot of January 13, 2008 "press release" on Stinger's Web site.
11. Screenshot of January 18, 2008 "press release" on Stinger's Web site.
12. 1/28/08 report from Florida Gulf Coast University Weapons & Equipment Research Institute (extracts)
13. 1/28/08 letter
14. 5/22/08 letter from the United States Department of Justice
15. 9/6/08 e-mail from Kevin Scholtz
16. Stinger packet document