UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TASER INTERNATIONAL, INC., <br><br>          Plaintiff, <br><br>    v. <br><br>STINGER SYSTEMS, *et al.*, <br><br>          Defendants. | Case No. 2:09-cv-289-MMD-PAL <br><br>ORDER <br><br>(Claim construction briefs <br>– dkt. nos. 203, 207, 214) |

This Order addresses the disputed claim terms presented for the Court to construe in connection with Defendant James F. McNulty Jr.'s counterclaim for patent infringement. The Court has reviewed the Joint Claim Construction and Prehearing Statement, McNulty's *Markman* Bench Trial Brief, Plaintiff TASER International, Inc.'s Responsive Claim Construction Brief, McNulty's Reply to Counter Defendant TASER's Responsive Claim Construction Brief, and McNulty's Rule 26(a)(2)(B) Written Report of Counterclaimant Expert. (Dkt. nos. 193, 203, 207, 214 and 280.) The Court also permitted McNulty to present expert testimony and heard argument from McNulty and TASER International, Inc.'s counsel.

**I.    BACKGROUND**

Plaintiff TASER International, Inc. ("TASER") filed its original Complaint in this case on February 11, 2009, against Defendants Stinger Systems ("Stinger"), James F. McNulty, Jr., and Robert Gruder, alleging (1) violations of the Securities Exchange Act of 1932, 15 U.S.C. § 78j(b); (2) trade libel/defamation; (3) unfair competition in violation of

the Lanham Act, 15 U.S.C. § 1125(a); (4) abuse of process; and (5) deceptive trade practices. Upon Defendants' motion, this Court dismissed the Securities Exchange Act claim. TASER filed its Second Amended Complaint ("SAC") on July 28, 2010, alleging all but one of the same claims, replacing the Securities Exchange Act claim with a civil conspiracy claim. (Dkt. no. 89.)

With the Court's leave, McNulty filed an answer to the SAC along with two patent infringement counterclaims, which he later amended and filed on May 2, 2011. (Dkt. nos. 92 and 190.) In the Amended Counterclaim, McNulty alleges that TASER's XREP and X12 model stun guns, or electronic control devices ("ECDs"), infringe on two of his patents, United States Patent Nos. 5,831,199 ("the '199 Patent") and 6,877,434 ("the '434 Patent"). After submitting their claim construction briefs on the counterclaims, a *Markman* hearing was held on August 7, 2012. (Dkt. no. 285.)

At the hearing, the expert declaration of Dr. Jeffrey Rodriguez was considered in addition to expert testimony by McNulty himself. TASER lodged a general objection to McNulty's expert testimony as exceeding the scope of his Rule 26 disclosures and as extrinsic evidence. The Court sustained those objections and noted that inventor testimony, like expert testimony, still amounts to extrinsic evidence. In construing the disputed terms, the Court was careful to distinguish between legal argument that McNulty presented as a *pro se* counterclaimant and extrinsic support in the form expert testimony that McNulty provided as a scientific expert and inventor testimony that McNulty provided as the patentee.

## II.   LEGAL STANDARD

Patent claim construction is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). When interpreting claims, a court's primary focus should be on the intrinsic evidence of record, which consists of the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005) (en banc). The court should begin by examining the claim language. *Id.* at 1312. Claim language should be viewed through the lens of a

2

person of "ordinary skill in the relevant art at the time of the invention." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1283 (Fed. Cir. 2005). If the claim language is clear on its face, then consideration of the other intrinsic evidence is limited "to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

A court should give the claim's words their "ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13 (quotation omitted). In construing a claim term's ordinary meaning, the context in which a term is used must be considered. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Both asserted and unasserted claims of the patent also can add meaning to a disputed claim term as claim terms normally are used consistently throughout the patent. *Phillips*, 415 F.3d at 1314. Additionally, where the patents at issue "all derive from the same parent application and share many common terms, [the court] must interpret the claims consistently across all asserted patents." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

"[C]laims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quotation omitted). The specification can offer "practically incontrovertible directions about a claim meaning." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). For example, the patentee may act as its own "lexicographer" and give a specialized definition of a claim term either explicitly or implicitly, in which case the specification acts as a dictionary for the patent. *Id.*; *see also Phillips*, 415 F.3d at 1321. "Likewise, inventors and applicants may intentionally disclaim, or disavow, subject matter that would otherwise fall within the scope of the claim." *Abbott Labs.*, 566 F.3d at 1288.

"When consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification." *Id.* "[A]lthough the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into claims when the claim language is broader than such embodiments." *Tate Access Floors, Inc. v.*

*Maxcess Techns., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) (quotation omitted). "By the same token, the claims cannot enlarge what is patented beyond what the inventor has described in the invention." *Abbott Labs.*, 566 F.3d at 1288 (internal quotation omitted).

Pursuant to the definiteness requirement in Section 112 of the Patent Act, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. Whether a claim satisfies this requirement is a matter of law determined by the court construing the patent claims. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citing 35 U.S.C. § 112, ¶ 2). "[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Id.* Thus, the standard for determining indefiniteness is whether "the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing." *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (quotation and alteration omitted). However, because of the statutory presumption of patent validity, claim terms are considered invalid for indefiniteness "only if reasonable efforts at claim construction prove futile." *Id.* Clear and convincing evidence therefore must be shown to invalidate a patent. *Datamize*, 417 F.3d at 1348.

In addition to the specification, a court also should consider the patent's prosecution history which consists of "the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. However, because the prosecution represents an "ongoing negotiation" rather than the "final product" of the negotiation, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Consulting the prosecution history can, however, be helpful in determining whether the patentee disclaimed an interpretation during prosecution. *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1296 (Fed. Cir. 2005). "Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a

clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

If the claim language is not clear after reviewing all intrinsic evidence, then the Court may refer to extrinsic evidence such as expert testimony, inventor testimony, dictionaries, and learned treatises. *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.,* 206 F.3d 1408, 1414 (Fed. Cir. 2000). "Relying on extrinsic evidence to construe a claim is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence. Such instances will rarely, if ever, occur." *Interactive Gift Exp., Inc.*, 256 F.3d at 1332 (internal quotation omitted).

III. **DISCUSSION**

The parties dispute 12 claim terms in the two patents. Summaries of their proposed construction of each disputed term are presented in comparison charts below. The Court will address each of the disputed terms.

A.  The '199 Patent

1.  **"High voltage"**

The parties dispute the meaning of the term "high voltage" as used in claim 12 of the '199 patent and claim 1 of the '434 patent.

| **Plaintiff TASER's Proposed Construction** | **Defendant McNulty's Proposed Construction** |
|---|---|
| Voltage sufficient to arc across a significant air gap, i.e. several thousand volts. | An open circuit potential (VO) large enough to cause injury or damage. There is no single voltage value at which an open circuit voltage (VO) is defined as a "high" voltage. The amplitude at which a voltage is defined as a "high" voltage is application specific. For example, for purposes of distancing persons from shock hazards from electrical equipment, the National Electrical Commission has defined a high voltage as a 600V potential capable of moving a steady state current. For open circuit potentials capable of moving pulsed currents of only a few milliseconds duration to directly stimulate human tissue, however, the medical and scientific |

| **Plaintiff TASER's Proposed Construction** | **Defendant McNulty's Proposed Construction** |
|---|---|
| | literature uniformly defines a high voltage as an open circuit potential (VO) at or above 100V. |

The claim language supports TASER's construction that the term "high voltage" has a fixed voltage amount.

McNulty's construction of the term "high voltage" fails because it conflicts with terms used in the patent and would potentially invalidate the patent due to failure to satisfy the enablement requirement. McNulty's construction - that "high voltage" means a voltage high enough to create a current that will cause injury - defines "high voltage" as those numerical voltage values that, within a given application, create a current that exceeds the "let go" threshold.[1] This construction requires that the Court construe the term "high voltage" as essentially a proxy for a particular current value above the "let go" threshold.[2] Were that so, claim 12 of the '199 patent ought to have instead read as follows: "An immobilization weapon for creation of a current exceeding the 'let go' threshold across spaced points on a live target toward which a projectile is launched." Rather than engage in a confusing game of scientific gymnastics in order to broaden the scope of the term "high voltage," McNulty ought to have replaced references to high voltage with references to current, for it is, as McNulty testified, current that does the immobilization, not voltage. Indeed, McNulty's construction would require the Court to understand "high voltage" as encompassing both "numerically low voltage" and "numerically high voltage," depending on the current and on whether injury occurred.

///

---

[1] According to McNulty's expert testimony, the "let go" threshold is 6 milliamps, which is the amplitude value of an electrical current that would prevent a person who came into contact with it from being able to release their body.

[2] The Court is mindful, however, that both parties' expert testimony made clear to distinguish between current and voltage.

TASER's construction of the term, supported by Dr. Rodriguez' expert testimony, supports a more sensible and internally consistent definition of "high voltage." When the '199 patent discusses the desirability of having a "high voltage output which can arc through atmosphere and, thereby, overcome impedances and resistances," '199 at 2:9-12, understanding the term "high voltage" as denoting an absolute voltage threshold renders this sentence consistent with the patent's earlier statement that "[a] human target can be incapacitated with much lower voltages." *Id.* at 2:3-5. These two sentences must be read in conjunction with one another to maintain consistency. *See Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication."); *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1356 (Fed. Cir. 2004) (construing claims "to ensure consistent interpretation of the same claim terms in the same patent"). A consistent interpretation of these statements reveals that lower numerical voltages might incapacitate a human target, but that higher numerical voltages are required to overcome impedances like clothing or air pockets. For this reason, the terms "lower voltages" and "higher voltage output" as they appear in '199 both refer to absolute voltage amounts.

McNulty asks the Court to construe "high voltage output" as distinct from the term "high voltage." He concedes that "high voltage output" refers to an absolute voltage amount, but testified that the term "output" shifts the meaning of "high voltage" from an application-specific, variable voltage count to an absolute voltage threshold. This construction stretches the boundaries of language, and creates utter confusion where none ought to exist. Were McNulty correct, the term "lower voltages" would also mean a contingent, application-specific voltage amount. Yet this conflicts directly with the consistent meaning of the two sentences. For that reason, there is no distinction in the way that the patent discusses "high voltage output" and "lower voltages" — the use of

///

"high" and "lower" both modify "voltage" by denoting absolute voltage values, regardless of whether the term "output" was added.

Further, McNulty's construction could render the patent invalid for failure to satisfy the enablement requirement. In order to be valid, the patent specification must set forth the "manner and process of making and using [the invention] in such full, clear, concise exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112, ¶ 1. Were this Court to reject Dr. Rodriguez's expert testimony and agree that McNulty's construction comports with that which is used by those skilled in the art, the very fact that he claims a broad set of numerical voltages contingent on any number of applications suggests that the claim is overbroad and not "full, clear, [or] concise."

The Court need not consider extrinsic evidence to reach its conclusion. But even if it did, the extrinsic evidence would support TASER's construction. First, Dr. Rodriguez described how, contrary to McNulty's expert testimony, voltage causes electrical arcs. (*See, e.g.*, Dkt. no. 209 at ¶ 13.) The Court thus gives little weight to McNulty's argument that TASER's construction is nonsensical because current, not voltages, causes arcing. Second, the Cover patents all disclose voltages in excess of several thousand volts, consistent with TASER's construction. (*See generally* dkt. no. 288-3.) Any reliance on the Cover patents by McNulty must recognize that they do not claim devices with numerically low voltage amounts. Third, none of the other extrinsic sources referred to by the parties, including the Institute of Electrical and Electronics Engineers standards, the New Oxford American Dictionary, and the Great Society Encyclopedia, provide constructions inconsistent with this definition of "high voltage."

///
///
///
///
///

The Court therefore holds that the term "high voltage," as used in the claims of the '199 and '434 patents, means "voltage sufficient to arc across a significant air gap, i.e. at least several thousand volts."[3]

### 2. Secondary propulsion device

The parties dispute the meaning of the term "propulsion" in "secondary propulsion device" from claim 12 of the '199 patent.

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| Component within the projectile that launches the second connector forward, i.e., toward the target. | A mechanism for separating by propulsion the second connector along with other parts of the projectile from the remaining projectile. |

No intrinsic evidence supports McNulty's construction that the term "propulsion" is broader than the construction offered by TASER. In his briefing, McNulty argues that the term propulsion contemplates firing the second connector at a 90 degree angle from the first connector (i.e., straight down from the projectile) or even at an angle greater than 90 degrees (i.e., *away* from the target). However, no intrinsic support in the patent itself exists for this expansive construction of the term "propulsion." If the connector was to not be launched toward the target, then it necessarily would fail to produce the required closed circuit that would enable the weapon's immobilization function. During the *Markman* hearing, McNulty intimated that this might nevertheless be consistent with a variant of the ECD that is a one-line grounded system. But that variant is not claimed, and the specification does not describe it. Claim 12 requires a second connector being directed out at a non-zero angle, and claim 15 claims a variant whereby the second connector is directed outward at an angle greater than 45 degrees. TASER's construction — that the second connector must be launched forward toward the target —

---

[3]The Court holds that "high voltage" means *at least* several thousand volts. TASER's construction appears to limit the absolute voltage amount to several thousand volts, yet the evidence and arguments on the record do not support limiting that absolute amount to merely several thousand. For example, Cover's patents refer to high voltages far exceeding several thousand volts.

is consistent with both claims, since an angle between 45 and 90 degrees might nevertheless be covered. Indeed, Figure 7 of the '199 patent discloses a preferred embodiment of the invention where the second connector launches at a 70 degree angle — an angle consistent with both claims 12 and 15. *See* '199 at 14:5-8.

Claims 12 and 15 cannot, however, contemplate a 90 degree or higher launch, since the one-line grounded system was not claimed anywhere in the patent and since firing the target at 90 degrees or greater would not be consistent with the immobilization mechanism disclosed in the patent. The Court does not need to look beyond the four corners of the patent to extrinsic evidence to reach this conclusion.

The Court therefore holds that "secondary propulsion device" in claim 12 means "component within the projectile that launches the second connector forward, i.e., toward the target."

### 3. Substantially adjacent said target

The parties dispute the meaning of the term "substantially adjacent said target" from claim 12 of the '199 patent.

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| Near, but before impacting, the target. | Within a range of distance from the target, where the second connector and other parts of the projectile can be propelled from the remaining projectile by the secondary propulsion device to both attain the target and electrically connect it to a shocking circuit. Substantially means 'enough,' and adjacent means 'near to or next to the target and, including, in contact with the target.' |

McNulty argues that this term claims a projectile launching the second connector both when it is near the target, and when it comes into contact with the target. McNulty points to the patent description that discusses the second connector being launched "at or near the target," including when the launching projectile "strikes the target" or when a delay switch that activates when the launching projectile "was in contact with the target."

10

(*See* '199 at 7:49-8:48.) TASER counters that the plain, unambiguous language of the term means near, but not contacting, the target.

The Court holds that the term "substantially adjacent said target" cannot include situations where the projectile touches the target. The parties correctly point out that the word "adjacent" may include both near and at a target. The modifier "substantially," however, modifies the term "adjacent" to necessarily mean less than whole, i.e., less than full contact. *See, e.g.*, *York Prods, Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572-73 (Fed. Cir. 1996) ("Ordinarily, therefore, 'substantially' means 'considerable in . . . extent,' or 'largely but not wholly that which is specified'" (internal citations omitted)). That the patent discloses various embodiments that describe the projectile hitting the target is irrelevant, since claims are interpreted to exclude certain embodiments inconsistent with unambiguous language in the claims. *See Sinorgchem Co., Shandong v. Int'l Trade Com'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007). Were McNulty's construction to control, the word "substantially" would be improperly written out of the claim language. *See, e.g.*, *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction that would render a claim limitation meaningless); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

The Court therefore holds that "substantially near said target" means "near, but not before impacting, the target."

### 4. Projectile

The parties dispute the meaning of the term "projectile" that appears in claims 12, 19, and 20 in the '199 patent.

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| Body projected by a launching device and connected to that launching device by one or more conducting wires. | A composite body projected by or for projection by an external force and continuing in motion by its own intertia. |

McNulty argues that tethering wires are a preferred embodiment, and are not necessarily claimed by the patent. He argues that claim 23, which claims "a wire tether attached to [the connectors]," modifies claim 12 by adding wire tethers to the projectile. Per the doctrine of claim differentiation, McNulty argues that claim 12 thus does not require a wire tethered to the projectile.

The intrinsic evidence before the Court demonstrates that the projectile must be tethered by a wire. There is no mention anywhere in the patent specification how the invention would operate in the absence of tethering wires. Further, the Patent and Trademark Office allowance statement specifically notes as a reason for allowance of the '199 patent the fact that the prior art does not disclose a wire-tethered projectile. (*See* dkt. no. 208-6.)

TASER offers further persuasive extrinsic evidence in the form of the '434 patent's discussions of the '199 patent. Since it was written by the inventor at a time proximate to the filing of the '199, the fact that the '434 describes the '199 patent as disclosing "the novel concept of employing a relatively large *wire-tethered* projectile" is persuasive evidence that the term "projectile" must be construed with the wired limitation. *See* '434 at 1:22-23. Were the '199 to have disclosed an untethered projectile, the '434 patent could not be seen as a range-extending improvement over the '199 patent.

The Court therefore holds that the term "projectile" means a "body projected by a launching device and connected to that launching device by one or more conducting wires."

### 5. Means on said casing for attachment to a rifle

The parties dispute the meaning of the term "means on said casing for attachment to a rifle" that appears in claim 20 of the '199 patent.

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| This limitation should be construed under 35 U.S.C. § 112, paragraph 6. The recited | A fastener mechanism comprising a flange on an ammunition cartridge, a flange seat |

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| function is "Attachment to a rifle." To the extent this term is not indefinite, the only disclosed structure linked to the recited function is an electrically insulative launching tube or discharger cup, which can be fitted onto the barrel termination of a rifle. | in a rifle barrel and a rifle slide or breech, which locks to chamber the ammunition cartridge in the rifle for firing. |

The use of the "means" language creates a presumption that it is to be construed as a 35 U.S.C. § 112, ¶ 6 means-plus-function claim. *See Callicrate v. Wadsorth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005). This presumption is rebuttable if the claim also includes a structure, which it does not do so here. *Id.* Given this presumption, the Court must first identify the function claimed and then ascertain the corresponding structures disclosed in the specification. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).

Here, the function claimed is "attachment" of the casing to the rifle. The only structure identified by the specification relates to the projectile being launched from electrically insulated launching tubes or discharger cups which could be fitted on to the barrel termination. McNulty seeks to claim a flange on an ammunition cartridge, a flange seat in a rifle barrel, and a rifle slide or breech. None of these devices are described in the specification, and the Court may not speculate as to the structure disclosed by a § 112, ¶ 6 claim. A proper construction of a means-plus-function claim should account for "all structure *in the specification* corresponding to the claimed function." *Callicrate*, 427 F.3d at 1369 (emphasis added).

For this reason, the Court agrees with TASER's construction and holds that the term "means on said casing for attachment to a rifle" claims a function of "attachment to the rifle" through the structure of an "electrically insulative launching tube or discharger cup, which can be fitted onto the barrel termination of a rifle."

///

///

13

**B.     The '434 Patent**

    **1.     Multistage projectile**

The parties dispute the meaning of the term "multistage projectile" that appears in claim 1 of the '434 patent.

| Plaintiff TASER's Proposed Construction | Defendant McNulty's Proposed Construction |
|---|---|
| Projectile composed of two or more separable parts, only one of which reaches the target. A stage is a "Separable part of the projectile." | A projectile comprising stages. A stage is "A projectile section, which is integrally and/or otherwise joined to another stage of the projectile, that is a composite body projected by or for projection by an external force and continuing in motion by its own inertia." |

The '434 patent specification describes an invention wherein the second stage of the projectile falls to the ground.  The Abstract states that the "higher mass of the second stage impacts the lower mass first stage at launch causing the first stage to be propelled to the target while the slower second stage hits the ground short of the target."  The invention summary notes that the second projectile "is designed to be diverted toward the ground short of the target and not actually impact the target," and that it "will fall short of the target." '434 at 2:29-31, 2:48.  Figure 3 of the '434 patent shows the second stage hitting the ground.[4]  There is no support in the patent for an invention wherein the second stage does not hit the ground.

McNulty makes a claim differentiation argument, arguing that dependent claim 8 ("The multistage projectile recited in claim 1 wherein said second stage has a mass that is greater than the mass of said first stage") necessarily narrows claim 1 to cover a second stage that is not heavier than the first.  Therefore, McNulty argues, both could

---

[4] Figures 2 and 3 illustrate the "present invention," rather than merely embodiments. '434 at 2:58-63. Figure 1, on the other hand, "is a cross-sectional view of an *exemplary embodiment*." *Id.* at 2:55-57. On this basis, the Court treats Figure 3 as an illustration of the invention rather than merely a preferred embodiment. *See, e.g., Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999) (distinguishing between figures of preferred embodiments and of inventions); *TI Group Auto. Sys. (North Am.), Inc. v. VDO North Am., L.L.C.*, 375 F.3d 1126, 1137 (Fed. Cir. 2004) (same).

potentially hit the target. McNulty makes a second claim differentiation argument: claim 5 ("The multistage projectile recited in claim 1 wherein said first stage has two of said electrical contacts and wherein said second stage has two of said wire tethers") says the contacts are in the first stage, so claim 1 would include when the contacts are in the second stage. These claim differentiation arguments both fail for the simple reason that, notwithstanding the language of the claims, the patent has only disclosed a version of the invention where the second stage falls to the ground. Further, McNulty has failed to demonstrate that a lighter second stage would necessarily impact the target.

McNulty also argued during the *Markman* hearing that his construction would allow for the situations wherein the rifle was fired at a distance close enough to the target such that both stages would impact the target. This scenario, though plausible, would be nothing more than a mistaken use of the patented invention. The purpose of the invention is to improve upon the '199 patent by providing increased range for the weapon.[5] *See, e.g.*, '434 at 1:46-50 (discussing the range limitations of the '199 patent). The use of the '434 invention in a situation where the target is close enough to be impacted by the second stage can only be deemed a mistaken use of the invention. The mere fact that an invention may be used inappropriately and against the stated purpose of the invention does not provide the patentee a monopoly over all uses of the invention, particularly when the descriptions of the mistaken use are nowhere to be found in the specification.[6] Doing so would contravene the bedrock principle behind the granting of

---

[5] McNulty argued that the impact of two stages on the target, as opposed to one, still constitutes an improvement over the '199 patent as the force applied by two impacts will create less injury than the force of a larger single impact. While that is undoubtedly true, the stated purpose of the '434 improvement was not to dilute the impact of a single projectile, but to increase the range of the '199 and to alleviate the cumbersome process of clearing the wiring from the rifle's bore. '434 at 1:42-48.

[6] To take an extreme example, the '434 patent cannot also claim the physical assault of a target with the rifle's butt. One might conceivably use an electrical immobilization-equipped rifle as a melee weapon, but that would be a mistaken use of the invention that bears no relationship with the claimed technologies or to the specification. That a user may so wield the rifle does not bestow to McNulty a patent monopoly for melee rifles.

patents: providing the public with adequate notice of the terms of a patent monopoly through specific descriptions of the invention and the patent claims. "The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and *disclosure* of new, *useful*, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." *King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed. Cir. 1995) (emphasis added). Those skilled in the art (and the public at large) should not be required to anticipate all of the mistaken, inadvertent, or accidental uses of an invention not described in the patent specification.

Based on the intrinsic record, the Court concludes that the term "multistage projectile" means "a projectile composed of two or more separable parts, only one of which reaches the target," where a stage is a "separable part of the projectile."

## IV.   CONCLUSION

IT IS SO ORDERED.

DATED THIS 16th day of August 2012.

_____
UNITED STATES DISTRICT JUDGE