UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TASER INTERNATIONAL, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>STINGER SYSTEMS, *et al.*,<br><br>    Defendants. | Case No. 2:09-cv-00289-MMD-PAL<br><br>ORDER<br><br>(Def.'s Motion for Partial Summary Judgment – dkt. no. 253;<br>Def.'s Motion for Partial Summary Judgment - dkt. no. 254;<br>Plf.'s Motion for Rule 56(d) Relief – dkt. no. 264) |

Before the Court are Defendant James F. McNulty, Jr.'s Motion for Partial Summary Judgment (dkt. no. 253) and second Motion for Partial Summary Judgment (dkt. no. 254), as well as Plaintiff TASER International, Inc.'s ("TASER") Motion for Rule 56(d) Relief (dkt. no. 264).

The relevant factual background in this case is set out in detail in the Court's August 3, 2012, Order. (*See* Dkt. no. 283 at 1-5.)

**I. LEGAL STANDARD**

Although motions for partial summary judgment are common, Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not contain an explicit procedure entitled "partial summary judgment." As with a motion under Rule 56(c), partial summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific

evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## II.   DISCUSSION

### A. McNulty's Motion for Partial Summary Judgment concerning the January patent reexamination releases (dkt. no. 253)

The first of McNulty's motions concerns Stinger Systems, Inc.'s ("Stinger") January 9, 10, and 11, 2008, press releases regarding Stinger's patent reevaluation request filed with the United States Patent and Trademark Office ("PTO"). The crux of McNulty's argument is that TASER's failure to demonstrate the falsity of the information contained in these releases precludes Lanham Act liability for unfair competition. TASER counters by contesting McNulty's characterization of the releases as truthful and, alternatively, arguing that truthfulness is not a defense to a Lanham Act unfair competition claim.

#### 1. Press Releases

The January 9, 2008, press release headline was entitled "Stinger Systems Request Reexamination of Taser International's Intellectual Property." (Dkt. no. 95-5.) The subheading read "Large Portion of Taser's Intellectual Property in Jeopardy." The release began by stating that the "[t]he United States Patent and Trademark Office is currently evaluating whether to reexamine Taser International, Inc.'s (Nasdaq: TASR) United States Patent 7,234,262." The release went on to note that "[it] is alleged" by Stinger's request to reexamine TASER's '262 patent (filed by TASER in December 2, 2005) that TASER failed to inform the PTO that its '262 patent claimed inventions embodied in TASER's M-26 electronic control device (commonly referred to as a stun gun, or "ECD") model. This fact would, according to the release, invalidate the '262

3

patent, since the M-26 model had been in production since 2000, thereby rendering the '262 obvious and unpatentable under 35 U.S.C. § 103(a).  The release also described how "it is alleged" that the '262 patent was erroneously designated as a continuation of TASER's earlier patent application dating back to September 17, 1999.

Further, the January 9, 2008, release claimed that the consequence of Stinger's then-pending lawsuit against TASER would be to invalidate TASER's '262 patent family on the grounds of inequitable conduct arising out of the allegations discussed above. The release ended with a lengthy quote attributed to McNulty offering his opinion that TASER "has not done a proper job of filing these patents" and that the "the financial markets are under the misimpression that Taser International has a patent monopoly on projectile stun guns."

The January 10, 2008, release (dkt. no. 95-6) issued by Stinger responded to a report published by independent firm Jeffries & Company ("the Jeffries report") earlier on the same day.  The Jeffries report allegedly described Stinger's January 9, 2008, release as "misleading" and the ensuing stock sell-off as "an overreaction."  Stinger's January 10, 2008, release in response described the Jeffries report as "grossly inaccurate" because, contrary to the report, the '262 patent directly impacts both the older TASER M-26 model and the newer and more popular TASER X26 ECD.  McNulty was quoted in the statement as urging analysts to investigate TASER's conduct and as describing the patent reexamination request as "quite serious."

Stinger's January 11, 2008, release (dkt. no. 95-8), entitled "Stinger Systems Comments on Taser International Patent Case Comments," described the statistical likelihood that patent reexamination requests cancel or amend claims and quoted Stinger CEO Robert Gruder as saying, among other things, that "most law enforcement agencies that Stinger personnel have called on strongly prefer the Stinger S-200 [a competing ECD] over the Taser X26."  The release also cited Stinger's lawsuit charging TASER with inequitable conduct, and again implied that the family of TASER patents were at risk of invalidation.

4

**2. Analysis**

"The Lanham Act was intended to make actionable the deceptive and misleading use of marks and to protect persons engaged in commerce against unfair competition." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992) (quoting 15 U.S.C. § 1127). "Lanham Act Section 43(a) [codified as 15 U.S.C. § 1125(a)(1)] jurisprudence recognizes two distinct protectable interests: protection against unfair competition in the form of an action for false advertising and protection against false association in the form of a lawsuit for false endorsement." *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1116-17 (C.D. Cal. 2003).

The prohibition on unfair competition under section 43 of the Lanham Act provides that

> [a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....
>
> * * *
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "Section 43(a), 15 U.S.C. § 1125(a), is one of the few provisions [of the Act] that goes beyond trademark protection and addresses unfair competition." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1143 (9th Cir. 2008) (quoting *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003)).

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Even if the releases are literally true, the Lanham Act prohibits misleading, confusing, or deceptive advertisements. *Id.*

///

McNulty argues that the statements contained in the three releases are true. McNulty notes that TASER, in its Second Amended Complaint ("SAC"), understated the impact that patent reexamination requests have on a patent. TASER alleged that only 12% of patent reexamination requests result in the cancellation of patent claims. (Dkt. no. 89 at ¶ 116.) McNulty argues that this figure, derived from *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1110 (N.D. Cal. 2006), is misleading.[1] He notes that 94% of reexamination requests are opened and, of those, 76% of reexaminations result in claims being narrowed or cancelled.[2] As a result, McNulty argues, there was a strong likelihood that TASER's claims would have been narrowed or cancelled. McNulty also points to an admission made by TASER that its X26 model ECD embodies at least one invention claimed in the '262 patent, thereby jeopardizing TASER's products as stated in the release. (Dkt. no. 253-D.) Lastly, McNulty argues that since a finding of inequitable conduct can result in invalidation of all patents in a patent family, *see, e.g.*, *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) ("inequitable conduct with respect to one or more patents in a family can infect related applications"), three total patents were subject to invalidation. For these reasons, the claims that TASER's patents were "in jeopardy" was true. (*See* Dkt. no. 95-5.)

McNulty has failed to demonstrate as a matter of law that the press releases are either true or not misleading. Since the Lanham Act requires an analysis into whether the releases appear misleading in context, it is plainly true that a reader of the three releases at issue here would believe that TASER was on the brink of a serious collapse. For example, the press releases made the following allegations:

- TASER's intellectual property is "in jeopardy." (Dkt. no. 95-5.)

---

[1] *Telemac* used data cited in a 1992 District of Delaware case that, in turn, referred to the Patent and Trademark Office's reexamination filing data published on March 31, 1991. *See Rohm & Haas Co. v. Brotech Corp.*, 1992 U.S. Dist. LEXIS 21721, at *11 (D. Del. July 16, 1992).

[2] This 76% is derived from 12% of patents that are cancelled altogether without modifications and 64% of patents are modified by narrowing their claims.

- TASER's patents "may all be invalidated if Stinger's argument in the case prevails." (Dkt. no. 95-5.)
- "[T]he patents contained [in Taser's portfolio] are extremely narrow (and in some cases even farcical) patents." (Dkt. no. 95-5.)
- TASER is "feeding" misinformation to the financial markets. (Dkt. no. 95-6.)
- Analysts are urged to "look at Taser's conduct in recent federal court cases to gain a sense of the character of Taser's governance or lack thereof." (Dkt. no. 95-6.)
- Stinger announced in pleadings filed in its suit against TASER that 76% of reexaminations result in cancelled or amended patent claims. (Dkt. no. 95-8.)
- The Chairman of TASER's board is accused of only knowing Stinger's current sales pipeline if he violated security regulations and announced insider information. (Dkt. no. 95-8.)
- "[M]any departments currently using Tasers have expressed interest in trading them in for Stingers." (Dkt. no. 95-8.)

This information encompassed in releases issued in a span of three days could reasonably lead a reader to the conclusion that TASER is in serious danger. Thus the Lanham Act analysis must begin with the premise that the releases, regardless of their veracity, paint a dire picture for TASER.

The literal truth of statements contained in the releases does not defeat the Lanham Act claim. *See Southland Sod Farms*, 108 F.3d at 1139. While it is literally true that Stinger filed a patent reexamination request, the request initially failed to meet filing requirements until March 5, 2008, the date at which it was considered officially filed. (*See* Dkt. no. 263-2 at ¶ 2.) After its official filing date (nearly two months after the publication of the press releases) the PTO on May 7, 2008, denied the request for failing to establish any "substantial new question of patentability." (*Id.*) Contrary to McNulty's quoted assertions in the press releases, it appears that the reexamination request was not "quite serious" in nature. TASER's allegation that the PTO reexamination was filed

merely to facilitate the issuance of press releases is consistent with its allegation that the Stinger lawsuit was also brought for the same purpose.

Further, McNulty has not met his burden of demonstrating that the patent reexamination statistics cited in the releases are accurate. They appear, on the contrary, to be based on old data, and deployed in the releases in a manner that would mislead a reader into believing that it is all but a foregone conclusion that TASER's patents will be rendered invalid. Even were the statistics true at the time of the release, their packaging alongside claims about TASER's inequitable conduct, quotations about Stinger's superior products, and TASER's poor corporate governance all support a Lanham Act unfair competition claim. Even if the '262 patent claimed some embodiment that existed in TASER's newer ECD model, a consumer would understand the release as jeopardizing much of TASER's patent portfolio.[3] A genuine issue of material fact thus exists as to whether these releases, taken as a whole, contain false and/or misleading information regarding the impact of the patent reexamination requests and the Stinger lawsuit on TASER's patents and ECD product line. It will be for a jury, not the Court, to decide whether the releases are misleading.

**B. Motion for Partial Summary Judgment concerning the Bestex release (dkt. no. 254)**

McNulty also seeks summary judgment on the Lanham Act claims arising out of the January 17, 2008, Bestex release. In its SAC, TASER alleges that the Bestex release was issued in response to McNulty's attempts to broker a fraudulent relationship between Bestex and LEA in an effort to portray the two companies as entering in a business relationship, all with an eye toward pushing the value of the companies up and damaging TASER's stock. TASER alleges that in January 2007, McNulty approached Law Enforcement Associates ("LEA") President Paul Feldman with the idea of

---

[3] This is further corroborated by the fact that the January 10, 2008, release refers to a canceled TASER patent for a non-lethal landmine, while the January 11, 2008, release refers to a TASER patent that is "at risk of cancellation" for non-payment of maintenance fees – both facts seemingly unrelated to the patent reexamination request.

1  developing a fraudulent relationship, but that in February 2007 LEA's board categorically
2  rejected McNulty's advances.  Feldman wrote McNulty on February 9, 2007, notifying
3  him that after some discussions, LEA's Board decided not to enter into any contract with
4  McNulty or Bestex concerning McNulty's proposal (hereinafter "Feldman e-mail").
5  Notwithstanding this rejection, TASER complains that the Bestex release misleadingly
6  implied that discussions between Bestex and LEA were ongoing, even though the
7  release was issued almost a year later in January 2008.

8  The release issued by Bestex was entitled "Bestex Company, Inc. to introduce
9  new projectile stun gun models to consumer market. Company files briefs in Taser
10 case." (Dkt. no. 95-1.)  It opened by announcing the production and sale of new stun
11 guns to compete against TASER and noting that these stun guns will sell "for a fraction
12 of the cost" of TASER's competing C2 line.  The release then included a lengthy quote
13 from Bestex CEO Yong Su Park in which he attacks TASER's January 10, 2008, release
14 as including "absolutely false and misleading statements" and "absolutely outrageous
15 and unprecedented" statements.  The release went on to describe as false TASER's
16 statements that Bestex had exited the stun gun market.

17 McNulty disputes TASER's arguments as chronologically flawed.  McNulty asserts
18 that since the discussions between Bestex and LEA ended in February 2007 with the
19 Feldman email, the January 2008 Bestex release could have related to discussions held
20 between the two companies in the interim period.  In support of his Motion, McNulty
21 offers deposition testimony of Feldman where Feldman was asked if he recalled
22 discussions with Bestex in 2008 (after the alleged rebuff by the LEA board) to enter into
23 a joint venture.  Feldman responded that "it's a possibility," but that those conversations
24 occurred in the lead up to "the discussions where we went to the board [of LEA] and –
25 with the comments you were making and it's – and your suggestions, that's when the
26 board of directors and Mr. Littman insisted that we do not – not do anything with you."
27 (Dkt. no. 254-C at 1.)  Asked if those conversations occurred in January, February, or
28 ///

March 2008, Feldman responded: "As I sit here right now – I have no exact recollection of it, but [it] sounds familiar." (*Id.* at 2.)

As further evidence that the Bestex release's claims regarding ongoing conversations between LEA and Bestex were true, McNulty offers a transcript of a recorded conversation between Feldman and McNulty on February 27, 2008, that allegedly documents such conversations between Bestex (through McNulty) and LEA (through Feldman). (Dkt. no. 254-B.) The conversation describes a call that Feldman had with Park where Park said that "I think I would like to do this again," and that he "has an idea for the old spring-loaded thing." (*Id.* at 2.) Feldman was also recorded describing the effect of the Bestex release on LEA:

> And everybody's calling me saying, "What is this?" You know, I mean, "What do you know about this?" I said, "I don't know." Read it to me. And, they said, "Is this stock -- you need to talk to somebody. This isn't true." Then I read it. I said, "Well it's true." The timeline isn't really exact. But, I said, "There's nothing he said isn't true. The conversation did -- it did happen." You know, but it was a -- Jeff High, who works at (inaudible) Piper High. That phone rang off the hook that day. I mean, everybody thought we were building tasers that day.

(Dkt. no. 254-F.) In addition, the transcript documents Feldman and McNulty's conversation about Park, Park's products, and other issues.

Based on this record, there exists genuine issues of material fact precluding summary judgment in favor of McNulty on the Bestex release. First, McNulty has not demonstrated that the Bestex release's description of the ongoing discussions between LEA and Bestex was true. The evidence cited above does not conclusively demonstrate that further discussions occurred between the two companies after the Feldman e-mail.[4]

---

[4] McNulty argues in his Motion that this email is unauthenticated and fraudulent. He attaches what appears to be at least two versions of the email as an exhibit to his Motion, alongside a handwritten note from an individual who says he could not locate that letter, both of which, McNulty argues, demonstrate that the email was forged. (*See* dkt. no. 254-G.) McNulty also attaches a print-out of what appears to be his email inbox listing emails received near the date of the Feldman email. (Dkt. no. 254-H.) The print-out does not list any email from Feldman from the list, but does include nine (9) redacted email listings. On the basis of this evidence, this Court cannot conclude that the Feldman email was fraudulent.

1  The Feldman deposition is inconclusive, since Feldman specifically denies recalling
2  when the conversations occurred. He did, however, say that they occurred in the lead-
3  up to the LEA Board's decision about potential agreements between LEA and Bestex.
4  This suggests that the conversations between LEA and Bestex occurred *before* the
5  Feldman email was sent, notwithstanding Feldman's failure to recall the year of those
6  discussions. As a result, any suggestion of ongoing discussions between LEA and
7  Bestex a year later would potentially be misleading. Further, the February 27, 2008,
8  recording between Feldman and McNulty is irrelevant to whether the Bestex release was
9  true or false, since it occurred after the Bestex release was issued. To the extent that
10 the transcript discusses prior Bestex and LEA negotiations, it is inconclusive as to when
11 those discussions occurred. The Court does give some weight, however, to Feldman's
12 representations to McNulty in that February 27, 2008, conversation that he believed the
13 Bestex release was true and accurate. But this is not enough to overcome the
14 inconclusive nature of the evidence. For this reason, genuine issues of fact remain as to
15 whether any Bestex-LEA discussions occurred after February 9, 2007.

16 Notwithstanding the literal truth of the Bestex release, McNulty has failed to
17 demonstrate that the release is not misleading. For the same reasons discussed above
18 regarding the January 2008 releases, the evidence demonstrates that a factual question
19 exists as to whether the Bestex release was misleading. The February 27, 2008,
20 transcript quoted above suggests that consumers were misled to believe that LEA was
21 building ECDs that day. (Dkt. no. 254-F ("I mean, everybody thought we were building
22 tasers that day.").) The Bestex release also includes various attacks against TASER,
23 including that it should be "embarrassed and ashamed" to mention a case it had lost and
24 that TASER's conduct was ordered unethical and "highly suspect." Placed in the context
25 of the release of Bestex's arguably misleading suggestion of a relationship between LEA
26 and Bestex, McNulty cannot demonstrate as a matter of law that the release was not
27 misleading.
28 ///

11

For these reasons, McNulty's Motion for Partial Summary Judgment as to the Bestex release (dkt. no. 254) is also denied.

### C. TASER's Motion for Rule 56(d) Relief (dkt no. 264)

TASER seeks a ruling from this Court denying both of McNulty's partial summary judgment motions on the ground that TASER has not had adequate opportunity to reap the fruits of discovery for the purposes of responding to the Motions. Since the Court denies both Motions, TASER's Motion is denied as moot.

## III. CONCLUSION

The Court cautions all parties to avoid filing unnecessary motions, particularly in light of the claimed need for additional discovery.

IT IS HEREBY ORDERED THAT Defendant James F. McNulty Jr.'s Motions for Partial Summary Judgment (dkt. nos. 253 and 254) are DENIED.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Rule 56(d) Relief (dkt. no. 264) is DENIED.

ENTERED THIS 20th day of August 2012.

_____
UNITED STATES DISTRICT JUDGE